UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 23-cr-229 (JWB/LIB)

        Plaintiff,

                                      **ORDER AND**
v.                                    **REPORT AND RECOMMENDATION**

Dimitri Lamar Accardo-Rainey,

        Defendant.

This matter comes before the undersigned United States Magistrate Judge, pursuant to a general assignment made in accordance with 28 U.S.C. § 636, upon the Defendant's various pretrial Motions. The Court held a Motions Hearing on September 5, 2023, regarding Defendant's Motions. (Minutes [Docket No. 27]).

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motions were taken under advisement.

For the reasons discussed herein, Defendant's Motion for Discovery and Inspection, [Docket No. 15], and his Motion for Disclosure of Result and Reports of Forensic Testing, [Docket No. 20], are **GRANTED in part** and **DENIED in part**, as set forth herein. Defendant's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 16]; his Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 17]; and his Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 19], are **GRANTED**, as set forth herein. Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 18], is **DENIED as moot**.

Further, for reasons discussed herein, the Court recommends that Defendant's Motion to Dismiss Count Five of the Indictment, [Docket No. 21], be **DENIED**, and his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**.

## I.    Background

Defendant is charged with one (1) count of Conspiracy to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. (Indictment [Docket No. 1]). Defendant is also charged with three counts of Distribution of Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Indictment [Docket No. 1]). Lastly, Count 5 of the Indictment charges Defendant with being a Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Indictment [Docket No. 1]).

## II.    Defendant's Motions for Discovery and Inspection. [Docket Nos. 15, 18, 20].

Defendant seeks disclosure of any written, recorded, or oral statements made by Defendant or copies thereof in the possession, custody, or control of the Government, as well as, a copy of his criminal history. (See Def.'s Mot. for Discovery and Inspection [Docket No. 15]). Furthermore, Defendant requests permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by the Government as evidence in chief at the trial, or were obtained from or belonged to the Defendant. Defendant also requests permission to inspect and copy the results of any physical or mental examinations or scientific tests or experiments.

Defendant's Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], seeks the disclosure of any reports of forensic examination or forensic test results the Government intends to offer at trial. In addition to the reports of forensic examination and

forensic test results, Defendant also seeks the disclosure of various materials underlying the DNA testing which took place in the investigating of the present matter. Defendant does not, however, provide the Court with the legal basis under which he believes he is entitled to the disclosure of these items which are not encompassed by Rule 16.[1]

In its written response to Defendant's Motions, the Government asserts that it has already disclosed certain materials pursuant to Rule 16. The Government further asserts that it will continue to comply with its obligations. The Government objects to Defendant's Motions to the extent the Motions seeks materials beyond the scope of Rule 16.

Federal Rule of Criminal Procedure Rule 16 is the primary avenue available to a criminal defendant seeking discovery. United States v. Siewert, No. 08-cr-4 (DWF/SRN), 2008 WL 3165852, at *2 (D. Minn. June 10, 2008). Typically, a criminal defendant has no general constitutional right to discovery from the Government beyond Rule 16. Siewert, 2008 WL 3165852, at *2; United States v. Johnson, 228 F.3d 920, 924 (8th Cir. 2000) ("Criminal Defendants do not have a general constitutional right to discovery."). "Neither Fed. R. Crim. P. 16(a), governing information subject to disclosure by the Government in criminal cases, nor any other federal rule or statute requires the Government to supply names of potential witnesses to a criminal defendant in a non-capital case." United States v. Hutchings, 751 F.2d 230, 236 (8th Cir. 1984); see United States v. Roach, 28 F.3d 729, 734 (8th Cir. 1994). In circumstances like the present case, "a defendant must point to a statute, rule of criminal procedure, or other

---

[1] Additionally, Defendant's Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], and his Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 18], request written summaries of any expert opinion the Government intends to use in its case-in-chief. Defendant's request for an Order directing the Government to disclose a written summary of expert testimony it intends to use as evidence at trial is, however, moot. In compliance with Federal Rule of Criminal Procedure 16(a)(1)(G), the Court previously issued an Order, [Docket No. 12], requiring the parties to disclose the identity of any case-in-chief expert witness and make all such expert disclosures required by Federal Rule of Criminal Procedure 16 no later than twenty-eight (28) days before trial with the disclosure of any rebuttal experts thereto being required no later than fourteen (14) days before trial.

entitlement to obtain discovery from the government." United States v. Johnson, 228 F.3d 920, 924 (8th Cir. 2000).

In the present case, Defendant fails to point the Court to any legal authority entitling him to the materials he requests beyond the scope of Rule 16, including the materials underlying the DNA testing. It is Defendant's obligation to highlight the statute or rule which entitles him to the discovery requested. Here, Defendant fails in that obligation.

Therefore, with regards to Defendant's additional requests that are outside the scope of Rule 16, for which Defendant fails to offer any specific legal authority, the present Motions are **DENIED** in part.[2]

To the extent Defendant's Motion for Discovery, [Docket No. 15], and his Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], seek the disclosure of materials specifically responsive to Rule 16(a)(1)(A)-(F), Defendant's Motion for Discovery, [Docket No. 15], and his Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], are **GRANTED** in part. Except for the disclosure of experts, the Government shall disclose any subsequently acquired materials or information which are specifically responsive to Rule 16 to the Defense as soon as said responsive materials are discovered by the Government and in any event by no later than fourteen (14) days before trial.

## III.    Defendant's Motion for Disclosure of 404(b) Evidence. [Docket No. 16].

Defendant seeks disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def.'s

---

[2] To the extent Defendant's Motion for Discovery, [Docket No. 15], and his Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], seek the disclosure of materials not specifically responsive to Rule 16(a)(1)(A)-(F), Defendant's Motion for Discovery, [Docket No. 15], and his Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], are denied. To the extent Defendant's Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], seeks the disclosure of experts, Defendant's Motion for Disclosure of Results and Reports of Forensic Testing, [Docket No. 20], is denied as moot. Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 18], is denied as moot.

Motion for Disclosure of Rule 404(b) Evidence [Docket No. 16]). Defendant also seeks an Order of this Court directing the Government to identify the basis of the evidence's admissibility and the identity of the witness through whom the evidence will be offered. (Id.).

In its written response, the Government acknowledged its obligation to comply with Rule 404(b). The Government suggest that Rule 404(b) disclosures be required no later than two weeks before trial.

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 16], is **GRANTED**, as set forth herein. As soon as practicable and in no event later than fourteen (14) calendar days before trial, the Government shall disclose to Defendant formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[3] As for the identity of the witnesses through whom the Government will offered said evidence, the Government shall disclose the identities of these witness seven (7) calendar days before trial or at the same time as required by the presiding trial judge to identify its other trial witnesses, whichever is earlier.

---

[3] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

IV.    **Defendant Motion to Compel Disclosure of Evidence Favorable to the Defendant.**
**[Docket No. 17].**

Defendant seeks disclosure of evidence favorable to him which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and their progeny. (See Def.'s Mot. [Docket No. 17]).

In its written response, the Government acknowledged its duty to disclose responsive materials and information under Brady, Giglio, and their progeny. The Government asserts that it has already made some disclosures of responsive materials and information under Brady, Giglio, and their progeny. The Government generically objects to Defendant's Motion to the extent it hypothetically seeks relief beyond the requirements of Brady, Giglio, and their progeny.

To the extent it seeks materials responsive to Brady, Giglio, and their progeny, Defendant's Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 17], is **GRANTED**, as set forth herein. The Government will disclose any and all remaining or subsequently discovered, obtained, or obtainable material responsive to Brady to the Defense as soon as said responsive materials are discovered by the Government.[4] The Government will disclose materials which are responsive to Giglio and related to the impeachment of the

---

[4] In his Motion, Defendant purports to list several categories of information which he believes warrants disclosure under Brady, Giglio, and their progeny, and he ostensibly wishes the Court to order the disclosure of these materials pursuant to Brady, Giglio, and their progeny. However, in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added); see Lingle v. Iowa, 195 F.3d 1023, 1026 (8th Cir. 1999). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril." Id. Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations.

Government's witnesses to be called at trial by no later than seven (7) calendar days before trial or when the presiding trial judge requires disclosure of trial witnesses, whichever is earlier.[5]

## V.   Defendant's Motion for Government Agents to Retain Rough Notes and Evidence. [Docket No. 19].

Defendant also requests an Order from the Court requiring any law enforcement agent to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (See Def.'s Mot. [Docket No. 19]). Defendant further seeks an Order of this Court requiring all such officials to preserve the evidence seized in the course of the Government's investigation of the present case. (Id.).

The Government does not object to Defendant's request for the retention of rough notes and evidence.

Defendant's Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 19], is **GRANTED** regarding rough notes as to retention only at this time. If Defendant seeks production or disclosure of rough notes, Defendant will need to bring a separate motion for such production. Defendant's Motion is also granted as to the retention of evidence seized in the investigation of the present case. Any such evidence will be produced in accordance with the Federal Rules of Evidence and this Court's Orders.

## VI.   Defendant's Motion to Dismiss. [Docket No. 21].

Defendant seeks an Order of this Court dismissing Count 5 of the Indictment which charges Defendant as being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Def.'s Mot. [Docket No. 21]). In support of this request, Defendant argues that following the United States Supreme Court's decision in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022), the charging statute in Count 5, 18

---

[5] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

U.S.C. § 922(g)(1), is unconstitutional as violative of the Second Amendment to the United States Constitution. (See Def.'s Mot. [Docket No. 21]).

As Defendants acknowledges, however, his argument is expressly foreclosed by the Eighth Circuit Court of Appeals' decision in United States v. Jackson, 69 F.4th 495 (8th Cir. 2023). In Jackson, the Eighth Circuit Court of Appeals, reviewing the constitutionality of § 922(g)(1) in light of New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022), upheld the "longstanding prohibitions on the possession of firearms by felons" and found § 922(g)(1) to be constitutional. Jackson, 69 F.4th at 501–06. As the Jackson Court held, the constitutionality of § 922(g)(1) is "[c]onsistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons . . . ." Id. at 505–06. This Court is bound to apply the precent of the Eighth Circuit. See, e.g., M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 459 (8th Cir. 2008); Hood v. United States, 342 F.3d 861, 864 (8th Cir. 2003).

Therefore, the undersigned recommends that Defendant's Motion to Dismiss Count 5 of the Indictment, [Docket No. 21], be **DENIED**.

## VII.   Defendant's Motion to Suppress. [Docket No. 23].

Defendant's present Motion seeks to suppress all evidence obtained as a result of the January 24, 2023, search of a residence, including the seizure of two firearms. (Def.'s Mot. to Suppress [Docket No. 23]). Defendant offers three arguments in support of his Motion to Suppress.

As a primary argument, Defendant asserts that the seizure of the firearms from the residence was the poisonous fruit of law enforcement's initial, unconstitutional entry into the residence. (Id.). Defendant's second argument acknowledges that law enforcement did

eventually obtain a search warrant for the residence, but he argues that the search warrant does not cure law enforcement's allegedly unconstitutional initial entry. (Id.). In the alternative, Defendant argues that the search warrant obtained by law enforcement is not supported by probable cause. (Id.).

### A. Facts[6]

On the evening of January 17, 2023, officers from the St. Cloud Police Department were dispatched to an apartment on 14th Avenue Southeast in St. Cloud, Minnesota after law enforcement had received a "shooting complaint." (Gov't Ex. 1).[7] An unidentified female caller reported that from outside the apartment she could see a male lying on the floor of said apartment, but she was unable to enter the locked apartment door. (Id. at 2).

Upon arriving at the scene, officers observed three minor children exit the apartment. (Id. at 2). Upon entering the apartment, officers observed an unresponsive male with apparent gunshot wounds lying face down on the kitchen floor and several cartridge casings inside the apartment. (Id. at 2). The male victim died as a result of the gunshot wounds. (See Id.). Near the victim's body, law enforcement officer also observed suspected narcotics in the form of white powder and pills in baggies that had been "twisted off." (Id. at 3).

A tenant of the apartment building informed law enforcement that after he was awaken by a scream, he looked out his door to see a male wearing a black facemask, black jacket, and black pants fleeing the building out the west door. (Id. at 3).

---

[6] The facts contained in this section are derived from the exhibits admitted in the present case, as well as, the testimony of Travis O'Leary at the September 5, 2023, Motions Hearing. Travis O'Leary is an Investigator with the St. Cloud Police Department.

[7] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant authorizing the search of the residence at issue, as well as, the completed search warrant return. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, warrant, and completed search warrant return into evidence as Government's Exhibit 1. (Tr. 8).

Law enforcement officers then viewed video surveillance footage to learn additional information. (Id.). In the video footage, law enforcement observed a "gray-ish SUV" pulling into the area shortly before law enforcement received the 911 call. (Id.). Several individuals exited the vehicle, entered the building, remained in the building for "several minutes," and quickly exited the building. (Id.). Two of these individuals then reentered the building. (Id.). During the time the two individuals were in the building, the "video system record[ed] apparent gunshot sounds." (Id.). At the time law enforcement viewed the surveillance video, they did not know the identity of any of the individuals in the video. (Id.).

On January 18, 2023, law enforcement officers responded to reports of gunfire near a residence on 34th Avenue North in St. Cloud, Minnesota. (Id. at 3). "Officers were advised that the suspect was described as a black male, approximately 5 foot 9 inched, last seen wearing all black clothing . . . in the area of the shooting." (Id.). An identified, male witness who had been on 34th Avenue North at the time of the shooting informed law enforcement that he saw the black male "stretch out his arms towards the North and he subsequently heard three to four 'pops'" which he believed to be from a handgun. (Id.). The male witness then observed the black male walk down an alleyway, approach an "older black female," and enter the 34th Avenue North residence with said female. (Id.).

Ultimately, the suspect exited the 34th Avenue North residence and surrendered himself to law enforcement. (Id. at 3–4). The male witness on the scene positively identified the male who surrendered to be the individual who the witness previously observed. (Id. at 4). The suspect was later identified as Demarcus Lee Washington ("Washington"). (Id.).

Law enforcement continued their investigation of the January 17, 2023, homicide. (Id.). During this investigation, an identified, female informed law enforcement that a male individual

going by the specific moniker of "Dino" had "set up a drug rip at the homicide location and that" Washington, A.P., R.H., and one additional male went to the apartment where the victim was ultimately shot. (Id.). She further informed law enforcement that she had heard that Washington was the person who shot the victim on January 17th. (Id.).

Law enforcement also spoke with R.H., who they suspected to be one of the individuals on the video who exited the vehicle outside the building where the homicide occurred. (Id. at 4). R.H., informed law enforcement that on the night of the homicide he, Washington, A.P., and one other individual were at the apartment building where the homicide occurred to purchase marijuana. (Id.). After unsuccessfully knocking on two apartments, including the victim's apartment, the individuals exited the building. (Id.). Washington, however, went back into the building to "try one more time at the victim's apartment." (Id.). Although R.H., did not go back to the victim's apartment with Washington, R.H., said he heard "several gunshots" during that time. A "short time later," Washington "came out and they left the building." (Id. at 4–5).

Officers also interviewed A.P., who also stated that he, R.H., Washington, and C.S., went to the building where the homicide occurred to purchase marijuana. (Id. at 5). A.P., indicated that Washington went into the building alone while the other three individuals waited outside. (Id.). After waiting outside for a time, A.P., and C.S., got into the vehicle and waited a brief period before driving a short distance into the parking lot. (Id.). After Washington exited the building and entered the vehicle, A.P., observed that Washington was breathing heavily and holding a black handgun. (Id.). A.P., heard Washington say, "I got down on him," which led A.P., to believe that Washington shot the victim. (Id.). A.P., then stopped the vehicle and instructed Washington to exit the vehicle. (Id.). Washington exited the vehicle near the Oak Street

Townhouses in the 400 block of 15th Avenue Southeast in St. Cloud, Minnesota. (Id.). A.P., told law enforcement that Washington did not leave the handgun in the vehicle. (Id.).

On January 24, 2023, law enforcement officers met with employees of the Oak Street Townhouses to review surveillance video from the night of the January 17th homicide. (Id.). Upon reviewing the video, law enforcement officers observed an individual they believed to be Washington running through the Oak Street Townhouse complex approximately one minute after the 911 call was made to law enforcement on the night of the homicide. (Id.). The male ran to an apartment at 435 15th Avenue Southeast (the "Residence"), and he was ultimately let inside. (Id.).

After identifying the tenant of the Residence as C.L., law enforcement officers, including Investigator Travis O'Leary with the St. Cloud Police Department ("Inv. O'Leary"), went to the Residence to speak with C.L., about the night in question. (Id.). When C.L., opened the door to the apartment, Inv. O'Leary introduced himself and asked C.L., if she had a moment to speak with the officers regarding the night of January 17, 2023. (Gov't Ex. 2).[8] After a brief interaction lasting approximately two minutes at the front door of the Residence, Inv. Henkemeyer asked C.L., if the officers could come into the Residence to speak with her regarding the investigation. (Id. at 00:29–2:40). C.L., immediately responded, "Yeah, as long as you don't judge me for the mess." (Id.). C.L., then opened the door wider, and the officers entered the Residence. (Id.).

Upon entering the Residence, C.L., informed the officers that she was not dressed under the towel she was wearing and informed the officers she was going to go get dressed. (Id. at

---

[8] Government's Exhibit 2 is a copy of the audio and video recording from the body worn camera of Investigator Henkemeyer with the St. Cloud Police Department who accompanied Inv. O'Leary to speak with C.L. on January 24, 2023. (Gov't Ex. 2). At the Motions Hearing, the Government, without objection, offered the video and audio recording into evidence as Government's Exhibit 2. (Tr. 10). Citations to the recording are provided in the MM:SS or HH:MM:SS format.

2:40–3:00). C.L., then went to the upper floor of the Residence, and the officers walked into the living room. (Id. at 2:40–3:30).

After C.L., returned to the living room, Inv. O'Leary asked C.L., if there were firearms in the Residence and informed her that the officers were looking for a handgun, to which C.L., stated there were no firearms in the Residence. (Id. at 3:30–3:45). C.L., also informed the officers that she was not at the Residence at the time Washington was observed entering the Residence on January 17, 2023. (Id.). Inv. O'Leary then informed C.L., that he wanted to search the Residence, and he asked if she would be willing to sign a consent to search form. (Id.). C.L., declined stating that she would "like maybe to not do that until [she] figured out a little more" about why the officers were at the Residence. (Id.).

Inv. O'Leary responded informing C.L., that the officers were going to attempt to obtain a search warrant for the Residence. (Id. at 3:45–4:00). Inv. O'Leary explained that the officers were going to draft an application for a search warrant; submit the application to a judge; and if the judge approved the application, search the Residence. (Id.). He also informed C.L., that the officers would remain at the Residence to secure it while other officers attempted to secure the search warrant. (Id.). Thereafter, the officers continued to discuss the circumstances surrounding their investigation with C.L., and Inv. O'Leary notified other law enforcement officers they should obtain a search warrant authorizing law enforcement to search the Residence. (Id. at 4:00–4:30).

During their conversation, C.L., asked if she could call a lawyer in her family because she felt like she was "in trouble" to which the officers responded by assuring her that she was not in trouble. (Id. at 4:15–4:45). When C.L., again became concerned that she was going to get in trouble, Inv. Henkemeyer informed C.L., that they were only concerned about finding items

associated with their investigation, including the handgun, and they were not concerned with anything else they may find in their search to which C.L., responded, "[e]ven if you found weed in my house, I have my medical card." (Id. at 8:10–9:30). At one point in the conversation, C.L., asks the officers if she could "grab [her] vape" to which Inv. Henkemeyer responded in the affirmative, but the officers also informed her that Inv. Henkemeyer would have to escort C.L., to retrieve the vape. (Id. at 9:30–10:30). Inv. Henkemeyer then accompanied C.L., upstairs to retrieve her vape; during their short walk, C.L., spontaneously stated that the officers were free to search her if they wished. (Id.).

Approximately fifteen minutes into the interaction, Inv. O'Leary informed C.L., that he was going to walk through the Residence to ensure no one else was present. (Id. at 15:00–15:36). C.L., then informed officers that she rented the basement to a male individual named "Meech," later identified as Defendant, who was then in the basement. (Id.). C.L., then yelled the following into basement: "Meech, Meech. The cops are here for what happened with [Washington] and they have a search warrant. They didn't want to scare you. They cops are here for something that happened with [Washington] and they didn't want to scare you. They have a search warrant." (Id.).

Approximately three minutes later, Defendant walks up from the basement of the Residence and begins speaking with Inv. O'Leary. (Id. at 18:20–18:50). When Defendant stated that he felt uncomfortable and began walking toward the front door of the Residence, Inv. O'Leary informed him that, before Defendant would be permitted to leave the Residence, the officers needed to get his name and to search him to make sure he did not have any items on his person for which they were there to search the Residence. (Id. at 18:50–20:16). Defendant declined to give his name and began walking towards the living room to wait with C.L. (Id.).

As Defendant began walking to the living room, he asked "where is the search warrant" to which Inv. O'Leary responded, "my boss is bringing it over." (Id. at 20:19–23:32). Defendant then began speaking with C.L., asking her why she let the officers into the Residence, and he told her to make the officers wait outside. (Id.). Defendant then turned to Inv. O'Leary saying, "Y'all can wait outside" to which Inv. O'Leary responded in the negative. (Id.). Defendant then began loudly conversing with C.L., repeatedly telling her to tell the officers to go outside on the porch. (Id.). Defendant then began alternating between speaking to C.L., and the officers saying the officers needed to leave the Residence. (Id.). During this time, the officers attempted to inform Defendant that they were in the Residence to secure it while the search warrant was being obtained by other officers. (Id.). Intermittently through this conversation, C.L., spoke on her phone with at least two individuals, and she made various statements to these individuals asserting that she had previously asked the officers to wait outside. (Id.).[9]

After Defendant attempted to walk around the Residence unaccompanied by officers and continued to ask the officers to leave in a loud manner, Inv. O'Leary asked C.L., and Defendant to exit the residence. (Id. at 23:33–33:30). When asked why they were being asked to step outside the Residence, Inv. O'Leary informed them it was because they were no longer being cooperative. (Id.). When C.L., and Defendant inquired about obtaining clothes more appropriate to the cold temperatures outside, the officers responded affirmatively. (Id.). Inv. O'Leary accompanied Defendant to the basement to retrieve appropriate clothing, and Inv. Henkemeyer accompanied C.L., upstairs to get appropriate clothing and shoes. (Id.).

After C.L., retrieved her items from upstairs, she and Inv. Henkemeyer returned to the living room. (Id. at 33:30–1:32:23). Throughout the interaction between Inv. Henkemeyer and

---

[9] C.L.'s statements here are not, however, supported by the recording of the interaction. She had not asked the officers to wait outside. (See Id.).

C.L., Inv. Henkemeyer repeatedly informed C.L., she was not in trouble and that the officers were only securing the residence until the search warrant arrived. (Id.). Except for one occasion when he walked to his vehicle to get a drink, Inv. Henkemeyer stayed with C.L., discussing various topics, including the investigation and the impending search. (Id.).

During this same time (approximately thirty minutes after the officers first arrived at the Residence), Officer Yang with the St. Cloud Police Department arrived at the Residence. (Gov't's Ex. 3).[10] Initially, Officer Yang stayed in the living room with C.L., and Inv. Henkemeyer. (Id. at 00:00–10:17). Approximately ten minutes after Officer Yang arrived, loud music began emanating from the basement, and Officer Yang walked into the basement to join Defendant, Inv. O'Leary, and at least one other officer. (Id.). Two minutes after Officer Yang entered the basement, Defendant stated that he could go wherever he wished, and Inv. O'Leary informed him that law enforcement would follow Defendant wherever he walked in the Residence. (Id.). The following exchange then took place:

> **Inv. O' Leary**: We would like you to go upstairs.
> **Defendant**: Nah. Nah. I'm sorry.
> **Inv. O' Leary**: You're going to stay down here? Then we are going to stay with you.
> **Defendant**: No, you're not.
> **Inv. O' Leary**: And if you can't leave the scene, we are gonna arrest you.
> **Defendant**: What?
> **Inv. O' Leary**: We are going to arrest you.
> **Defendant**: There is no scene without, there is no scene, there's no scene without no search warrant.
> **Inv. O' Leary**: The scene is the apartment.
> **Defendant**: There's no scene.
> **Inv. O'Leary**: The scene is the apartment.
> **Defendant**: There's no scene. What do you mean?
> **Inv. O' Leary**: And you need to leave your phone in the scene.
> **Defendant**: I'm not leaving shit.

---

[10] Government's Exhibit 3 is a copy of the audio and video recording from the body worn camera of Officer Yang with the St. Cloud Police Department. (Gov't's Ex. 3). At the Motions Hearing, the Government, without objection, offered the video and audio recording into evidence as Government's Exhibit 3. (Tr. 10). Citations to the recording are provided in the MM:SS or HH:MM:SS format.

> **Inv. O' Leary**: And we are going to
> **Defendant**: I'm not leaving shit. On my mama.
> **Inv. O' Leary**: And we are going to pat you down before you leave the scene.
> **Defendant**: On my mama. I am not leaving shit.
> **Inv. O' Leary**: Ok.

(Id. at 10:17–14:14). Defendant then continued to argue with the officers, and he placed his phone down his pants. (Id. at 14:14–15:19). Inv. O'Leary continued to attempt to talk to Defendant, but he continued to decline to cooperate, including declining to give his name. (Id. at 15:17–58:44).

Approximately fifty-eight minutes after Officer Yang arrived on the scene, four other officers entered the basement. (Id. at 58:44–1:18:33). One of the newly arrived officers then informed Defendant he was being placed under arrest for "first degree aggravated sales." (Id.). Defendant was placed under arrest and handcuffed before the arresting officers searched Defendant's person. (Id.). Defendant was then escorted to and placed in a patrol vehicle. (Id.).[11]

After Defendant was placed under arrest, Inv. O'Leary came up from the basement to rejoin the conversation in the living room where Inv. Henkemeyer and C.L., were located. (Gov't's Ex. 2 at 1:32:23–2:32:23). During this portion of the conversation, law enforcement officers were able to help C.L., obtain a digital copy of her medical marijuana card over the telephone. (Id. at 1:55:00–2:00:06). C.L., and the officers continued their conversation, including the circumstances and individuals surrounding the officers' investigations. (Id. at 1:32:23–2:32:23).

While the various officers were waiting at the Residence, Officer Daniel Trautman with the St. Cloud Police Department submitted an application for a search warrant authorizing law enforcement to search the Residence. (Gov't's Ex. 1). In support of this application, Officer Trautman submitted an affidavit containing the details of law enforcement's investigation of the

---

[11] Officer Yang transported Defendant to jail. (Id.).

January 17, 2023, homicide, up until the point in time that Inv. O'Leary and Inv. Henkemeyer made initial contact with C.L. (Id.). Officer Trautman attested that when the officers made contact with C.L., she allowed them into the Residence, and she denied having been at the Residence at the time Washington was observed entering the Residence on January 17, 2023. (Id.). The affidavit further noted that C.L., declined to consent to a search of the Residence, and that the officers "noted the distinct smell of marijuana emanating from" the Residence. (Id.).[12]

The Honorable Robert Raupp, District Court Judge for the State of Minnesota, Seventh Judicial District, County of Benton, determined that probable cause existed to support the issuance of the January 24, 2023, Search Warrant. (Id.). The January 24, 2023, Search Warrant authorized law enforcement officers to search the Residence for, among other things, firearms, documents related to the purchase or possession of firearms, firearm accessories, ammunition, and controlled substances. (Id.).

Immediately thereafter law enforcement officers, including Inv. O'Leary, executed the January 24, 2023, Search Warrant. (Id.). As a result of executing the January 24, 2023, Search Warrant, law enforcement discovered several items of contraband, including the two firearms at issue in the present action which law enforcement discovered in a safe located in the basement of the Residence. (Id.).

**B. Standard of Review**

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few

---

[12] The affidavit submitted in support of the search warrant application did not state that C.L., had a medical marijuana prescription.

specifically established and well-delineated exceptions." <u>United States v. Davis</u>, 569 F.3d 813, 816 (8th Cir. 2009) (citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). It is the government which bears the burden of demonstrating that an exception to the warrant requirement exists. <u>United States v. James</u>, 353 F.3d 606, 603 (8th Cir. 2003).

### C. Discussion

As observed above, Defendant seeks the suppression of all evidence obtained as a result of the search of the Residence in which he rented the basement. (Def.'s Mem. [Docket No. 33]). Defendant first argues that all such evidence must be suppressed because it is the "fruit of law enforcement's unconstitutional occupation of the [Residence] and detention of [Defendant], which were done without a warrant, exigent circumstances, or consent." (<u>Id.</u> at 5–16). Defendant next argues that "while law enforcement eventually obtained a search warrant prior . . . seizing the charged firearms, that warrant cannot cure" the purportedly unconstitutional conduct of the officers "because law enforcement exploited their unlawful presence inside the apartment" in obtaining and executing said warrant. (<u>Id.</u> at 5, 16–25). Lastly, Defendant argues that "even if the Court decides that the seizure of the firearms was not fruit of the investigators' unlawful occupation of the" Residence, the affidavit submitted in support of the search warrant fails to establish the probable cause necessary to support the issuance of the January 24, 2023, Search Warrant authorizing law enforcement to search the Residence. (<u>Id.</u> at 5, 25–27).

The Court finds each of these arguments to be unpersuasive. Each law enforcement action of which Defendant now complains was constitutionally permissible under the circumstances of the present case, and the issuance of the January 24, 2023, Search Warrant was supported by probable cause. The Court reviews each action and argument in turn below.

### 1. Law Enforcement Presence in Residence Prior to Search

As a threshold matter, the Court notes that Defendant does not argue that it was constitutionally impermissible for the officer to knock on the door of the Residence or to speak with C.L., while remaining outside the Residence. (See Def.'s Mem. [Docket No. 33]). Indeed, any such argument would be futile because "[t]his tactic, commonly referred to as a 'knock and talk'" has consistently been determined to be constitutionally permissible where law enforcement uses said tactic "in furtherance of a legitimate law enforcement objective." United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006); see United States v. White, 928 F.3d 734, 739 (8th Cir. 2019). This is true regardless of whether law enforcement approached the Residence to discuss the circumstances of an investigation or to ask only for consent to search the premises. See Weston, 443 F.3d at 667. In the present case, Inv. O'Leary and Inv. Henkemeyer had approached the Residence for a "knock and talk" in the furtherance of a legitimate law enforcement objective because immediately before approaching the Residence they, during their investigation of a homicide, had reviewed a surveillance video depicting a suspect entering the Residence appropriately one minute after the January 17th homicide.

After briefly speaking with C.L., through the closed screen door, Inv. O'Leary asked C.L., if the officers could come into the Residence to continue their conversation to which C.L., responded in the affirmative as she opened the front door wider to permit Inv. O'Leary and Inv. Henkemeyer to enter the Residence. This entry was constitutionally permissible pursuant to C.L.'s voluntary consent. See, e.g., United States v. Cross, 888 F.3d 985, 989 (8th Cir. 2018) (reiterating the proposition that the general prohibition against warrantless entry into a home is inapplicable to circumstances in which voluntary consent to enter has been obtained) (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)). The record now before the Court makes clear

that C.L., had actual and apparent authority over the Residence sufficient to permit her to consent to law enforcement's entry into the Residence. See, e.g., Id. Thus, law enforcement's entry into the Residence was constitutionally permissible because C.L., voluntarily consented to law enforcement's entry.[13]

After entering the Residence, Inv. O'Leary asked C.L., for her consent to allow law enforcement to search the Residence. C.L., declined to provide law enforcement with consent to search the whole of the Residence. Inv. O'Leary then informed C.L., that the officers would be securing the Residence while another officer sought to obtain a search warrant.

In determining whether the securing of a residence pending the acquisition of a search warrant is constitutionally permissible, Courts consider four factors: whether the officers securing the residence had probable cause to believe evidence of a crime or contraband was present in the residence; whether the evidence could be destroyed prior to the arrival of the search warrant; if law enforcement officers reasonable balanced the needs of law enforcement with the demands of person privacy; and the length of the seizure. Illinois v. McArthur, 531 U.S. 326, 330–33 (2001).

In the present case, these factors weigh in favor of finding that law enforcement's securing of the Residence while awaiting a search warrant was constitutionally permissible. See,

---

[13] Defendant's only argument related to C.L., having consented to law enforcement's entry into the Residence is Defendant's implicit argument that C.L.'s consent is somehow ineffective because Inv. O'Leary asked to enter the apartment to speak with C.L., regarding the investigation but upon entering, he asked for consent to search rather than simply continuing to discuss the factual circumstances of the investigation. (Def.'s Mem. [Docket No. 33] at 14). Defendant appears to take issue with the fact that Inv. O'Leary did not discuss searching the Residence until after C.L., had provided law enforcement with consent to enter the Residence. (Id.). This argument has, however, been rejected by the Eighth Circuit Court of Appeals. See United States v. Ortega-Montalvo, 850 F.3d 429, 434 (8th Cir. 2017); United States v. Crisolis-Gonzalez, 742 F.3d 830, 835 (8th Cir. 2014), as corrected (Feb. 11, 2014). As the Eighth Circuit has explained, under circumstances similar to the present case, "[t]here is no requirement that officers 'gratuitously advertis[e] [their] every move to anyone [they] might encounter." Ortega-Montalvo, 850 F.3d at 434 (alteration in original) (quoting Crisolis-Gonzalez, 742 F.3d at 835). This is especially true in circumstances, like the present case, in which the individual providing consent "agreed to let the [officers] inside without further inquiry as to the nature of the visit." Ortega-Montalvo, 850 F.3d at 434. In the present case, there was "nothing misleading about" Inv. O'Leary's request to enter the Residence to speak with C.L., because that request "was consistent with the overall goal of" investigating the homicide. See Id.

e.g., Illinois v. McArthur, 531 U.S. 326, 331–33 (2001); Segura v. United States, 468 U.S. 796, 798 (1984); United States v. Willard, No. 22-cr-80 (DWF/DTS), 2023 WL 2838102, at *4 (D. Minn. Jan. 11, 2023), report and recommendation adopted, 2023 WL 2401515 (D. Minn. Mar. 8, 2023); see, e.g., United States v. Ruiz-Estrada, 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing [an] apartment while awaiting a search warrant comports with the Fourth Amendment."); United States v. Roby, 122 F.3d 1120, 1125 (8th Cir. 1997). For all the reasons discussed below, relative to the existence of probable cause in support of the January 24, 2023, Search Warrant, law enforcement officers had probable cause to believe the Residence contained evidence of a crime at the time they secured the Residence pending arrival of the applied for warrant.

As for the second factor, there is no specific evidence that evidence inside the Residence would be destroyed prior to law enforcement obtaining a search warrant. Such evidence is not, however, necessary to find that law enforcement securing of a residence was constitutionally permissible. See United States v. Burrell, No. 06-cr-81 (JNE/RLE), 2006 WL 1715608, at *20 (D. Minn. June 19, 2006). In considering this factor under the circumstances of the present case, this Court is "not here confronted with a showing that has to satisfy a 'no knock entry,'" because this Court is "only determining whether the showing, and reasonable inferences from those showings, are sufficient to take the precautionary measure of securing the premises until a Search Warrant could be obtained." Id. at *21 (citing United States v. Moore, 956 F.3d 843, 848 (8th Cir. 1992)). Given the nature of the circumstances underlying the present case, it would not be unreasonable to conclude that law enforcement officers reasonably believed that evidence would be destroyed, lost, or materially altered if they left unsupervised individuals inside the Residence. In fact, at the September 5, 2023, Motions Hearing, Inv. O'Leary testified that he did

believe that evidence would be destroyed, lost, concealed, or altered if law enforcement officers left C.L., and Defendant in the Residence unaccompanied. (Tr. 69–70). The Court need not, however, reach even this conclusion here. In the present case, it is sufficient to find this factor to be neutral because all other factors weigh in favor of finding law enforcement's conduct to be constitutionally permissible.

The third and fourth factors weigh in favor of finding law enforcement's securing of the Residence to be constitutionally permissible. Law enforcement officers made reasonable efforts to balance the needs of law enforcement with the demands of personal privacy by permitting C.L., and Defendant to traverse the Residence, albeit while accompanied by a law enforcement officer. See Illinois, 531 U.S. at 332. The relatively short period of time law enforcement secured the Residence before a search warrant arrived—only three hours—combined with the fact that nothing in the present record indicates that officer were anything less than professional in their conduct in securing the search warrant weighs in finding law enforcement's seizure of the Residence to be constitutionally permissible. See in comparison, Segura v. United States, 468 U.S. 796, 812 (1984) (finding that 19-hour delay did not render law enforcement securing of the residence constitutionally impermissible).

Under the circumstances of the present case, the Court finds that, in briefly securing the Residence pending the arrival of a search warrant, law enforcement officers acted in good faith and with probable cause. The record now before the Court indicates that Inv. O'Leary had a good faith belief that other officers were securing a search warrant for the Residence, and for all the reasons discussed below relative to the existence of probable cause in support of the January 24, 2023, Search Warrant, law enforcement officers were acting upon their belief and with probable cause at the time they secured the Residence.

Nevertheless, Defendant argues that law enforcement remaining inside the Residence was unconstitutional because "[e]xigent circumstances did not justify law enforcement's decision to remain inside the apartment and detain [Defendant] without a warrant." (Def.'s Mem. [Docket No. 33] at 9). In making this argument, Defendant relies heavily on United States v. Ramirez, 676 F.3d 755 (8th Cir. 2012). (See Def.'s Mem. [Docket No. 33] at 9–13). This argument is unpersuasive because Defendant's reliance on Ramirez is misplaced.

Unlike the present case, Ramirez involved the issue of whether exigent circumstances existed to warrant law enforcement's warrantless, nonconsensual entry into a hotel room. Ramirez, 676 F.3d at 759. "Exigent circumstances" are not required for law enforcement to secure a residence pending the arrival of a search warrant. Indeed, Ramirez did not involve the issue of whether exigent circumstances warranted law enforcement remaining inside the hotel room while other officers secured a search warrant. See Id. Ramirez has no direct applicability to the present case.

Moreover, in finding that no exigent circumstances existed there to excuse law enforcement's nonconsensual, warrantless entry, the Court in Ramirez relied heavily on the fact that the persons inside the hotel room were completely unaware of law enforcement's presence before law enforcement attempted a forced entry. Id. at 762–64. This is materially distinguishable from the present case where C.L., was patently aware of law enforcement's presence at the time Inv. O'Leary informed her that law enforcement was securing the Residence pending arrival of a search warrant. Thus, Ramirez is factually and legally inapposite to the issue in the present case.

Defendant also unpersuasively argues that law enforcement unconstitutionally remained in the Residence pending the arrival of the search warrant because law enforcement "did not

have consent to remain inside the apartment to 'secure' it while they waited for the search warrant." (Def.'s Mem. [Docket No. 33] at 13–15). Consent is not necessary for law enforcement officers to secure a residence pending the arrival of a search warrant. See, e.g., Segura v. United States, 468 U.S. 796, 798 (1984) (discussing factors relevant to a court's consideration of whether law enforcement's seizure of a residence pending the arrival of a search warrant was constitutional); United States v. Burrell, No. 06-cr-81 (JNE/RLE), 2006 WL 1715608, at *20 (D. Minn. June 19, 2006); United States v. Roby, 122 F.3d 1120, 1125 (8th Cir. 1997); United States v. Bausby, 720 F.3d 652, 657 (8th Cir. 2013).[14]

Throughout his memorandum, Defendant presents an implicit argument that law enforcement had no basis to secure the Residence because the purported item for which they were searching, a firearm related to the January 17th homicide, was not an item easily destroyed. (See Def.'s Mem. [Docket No. 33]). Although the securing of a scene by law enforcement pending the arrival of a search warrant often occurs in cases involving narcotics and other easily disposable pieces of evidence, the need to secure a scene pending acquisition of a search warrant is not limited to circumstances involving readily disposable pieces of evidence or even easily concealable contraband. See, e.g., United States v. Bausby, 720 F.3d 652, 657 (8th Cir. 2013) (finding that officers acted reasonable in refusing defendant's request to enter a residence which had been secured pending the acquisition of a search warrant or to allow a witness to enter the residence in a case involving stolen vehicles); United States v. Szczerba, No. 4:15-cr-348 (HEA), 2016 WL 8668285, at *1 E.D. Mo. Dec. 30, 2016) (finding officer acted reasonable in securing apartment while awaiting a search warrant in case involving human trafficking for the purposes of sexual exploitation), aff'd, 897 F.3d 929 (8th Cir. 2018). Moreover, Defendant's argument

---

[14] The lack of a need for consent to secure a residence while other officers obtained a search warrant is also fatal to Defendant's argument that he attempted to withdraw consent as a "co-tenant." (See Def.'s Mem. [Docket No. 33] at 13–14).

here overlooks the fact that law enforcement would have been looking not only for a firearm but also for any other evidence related to the January 17th homicide, including evidence indicative of firearm usage or ownership, as well as, biological evidence on any firearm.[15]

In summary, law enforcement lawfully entered the Residence because C.L., voluntarily consented to law enforcement entering the Residence. She never withdrew her consent for the officers to be in the Residence; she simply did not expand her consent to include a warrantless search of the property. Further, law enforcement officers acted reasonably and in a constitutionally permissive manner when they remained in the Residence to secure the Residence while awaiting a search warrant.[16]

Therefore, to the extent Defendant's Motion to Suppress seeks an Order of this Court suppressing all evidence obtained as a result of the search of the Residence based on Defendant's argument that law enforcement unconstitutionally entered the Residence or unconstitutionally remained inside the Residence pending the acquisition of a search warrant, the undersigned recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**.

## 2.  Search Warrant

As observed above, Defendant further argues that even if the Court finds that law enforcement's initial entry into the Residence and securing of the Residence pending the arrival of a search warrant were constitutionally permissible, the evidence obtained as a result of the

---

[15] The January 24, 2023, Search Warrant executed at the Residence demonstrates that law enforcement sought permission to search the Residence for firearms, documents regarding the purchase or possession of firearms, firearm accessories, ammunition, documents bearing the murder suspect's name, controlled substances, electronic storage devices, a white shirt, and black pants. (Gov't's Ex. 1).

[16] Because the Court concludes that law enforcement's initial entry into the Residence and securing of the Residence pending the acquisition of a search warrant were constitutionally permissible, the Court need not and does not consider Defendant's argument that the subsequently acquired January 24, 2023, Search Warrant is tainted by the purported unconstitutionality of law enforcement's entry into the Residence or law enforcement's securing of the Residence.

execution of the January 24, 2023, Search Warrant should still be suppressed because the affidavit submitted in support of the application for the Search Warrant fails to establish the probable cause necessary to support the issuance of the January 24, 2023, Search Warrant. (Def.'s Mem. [Docket No. 33] at 5, 25–27). Defendant asks the Court to perform a four-corners review of the January 24, 2023, Search Warrant to determine whether probable cause exists to support the issuance of said warrant. (See Id. at 25).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be

considered in determining the existence of probable cause.'" United States v. Wiley, No. 9-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In making the probable cause determination, Courts "apply a common sense approach and consider all relevant circumstances." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

As an initial matter, Defendant argues that the January 24, 20323, Search Warrant issued without probable cause because the affidavit submitted in support of said Search Warrant failed to establish that evidence of the January 17th homicide would be found inside the Residence. (Def.'s Mem. [Docket No. 33] at 26). In support of this assertion, Defendant asserts that although the affidavit noted that surveillance video depicted a suspect entering the Residence shortly after the 911 call was reviewed, the affidavit does not indicate whether the suspect was seen entering the Residence with a firearm. (Id.). Thus, according to Defendant, the affidavit lacks a sufficient basis to believe that evidence relevant to the homicide would be found inside the Residence.

(Id.). Defendant's argument, however, ignores other critical portions of the affidavit submitted in support of the January 24, 2023, Search Warrant.

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the January 24, 2023, Search Warrant which authorized law enforcement to search the Residence, Judge Raupp could reasonably have concluded that there was a fair probability that evidence of a crime would be found in the Residence.

Specifically, the Court notes that, in his affidavit, Officer Trautman provided the details of law enforcement's investigation of the January 17, 2023, homicide, including information obtained from several individuals who identified Washington as the shooter. The affidavit also included information law enforcement learned from A.P., regarding what took place immediately following the shooting. Law enforcement was told by A.P., that after the shooting, Washington exited the building breathing heavily; entered the vehicle holding a handgun; and said, "I got down on him" which led A.P., to believe that Washington had shot the victim. A.P., then stopped the vehicle near the Oak Street Townhouses and instructed Washington to exit the vehicle. Officer Trautman further attested that A.P., had said the handgun was not left in the vehicle following Washington's exit from the vehicle. The affidavit also noted that officers viewed the

surveillance video from Oak Street Townhouses which depicted an individual, believed to be Washington, entering the Residence at issue approximately one minute after the 911 call regarding the January 17th shooting.

Upon review of Officer Trautman's affidavit, the Court concludes that Judge Raupp had a sufficient basis upon which to believe that probable cause existed for the issuance of the January 24, 2023, Search Warrant authorizing law enforcement to search the Residence. The affidavit contains sufficient factual information regarding Washington's suspected involvement in the shooting. The affidavit also contains information upon which Judge Raupp could reasonably conclude that Washington, after allegedly shooting the victim with a firearm and while still in possession of a firearm, exited A.P.'s vehicle in the Oak Street Townhouses parking lot and then entered the Residence at issue less than one minute later. Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search of the Residence would uncover evidence of a crime; thus, there was probable cause for Judge Raupp to issue the warrant. See gen. United States v. Malone, No. 21-cr-217 (SRN/BRT), 2022 WL 1486396, at *3 (D. Minn. May 11, 2022).

As for Defendant's assertion that the affidavit lacks probable cause because it lacks any indication that the individual entering the Residence is specifically seen holding or in possession of a firearm, the affidavit need not contain any such explicit assertion. See United States v. Malone, No. 21-cr-217 (SRN/BRT), 2022 WL 1486396, at *3 (D. Minn. May 11, 2022). The affidavit contains sufficient information upon which Judge Raupp could draw the reasonable inference that the individual entering the Residence was then in possession of a firearm—said individual entered a vehicle with a handgun, admitted to shooting, and exited a vehicle without leaving the firearm behind less than a minute before being recorded on surveillance video

entering the Residence at issue with no known intervening activity. See, e.g., United States v. Thompson, 210 F.3d 855, 860 (8th Cir. 2000).

Defendant also takes issue with the fact that nearly a week lapsed between the time of the video depicting the suspect enter the Residence and Officer Trautman's submission of his affidavit in support of the January 24, 2023, Search Warrant. (Def.'s Mem. [Docket No. 33] at 27). Without the benefit of any legal analysis or discussion, Defendant asserts that the information in the affidavit is stale because "[t]he application included no information to suggest that any evidence that might have been inside the apartment on January 17 would still be there on January 24." (Id.).

"A warrant becomes stale if the information supporting is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." United States v. Brewer, 588 F.3d 1165, 1173 (8th Cir. 2009) (internal quotations omitted). "There is no bright-line test for determining when information is stale"; instead, "time factors must be examined in the context of a specific case and the nature of the crime under investigation." United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007). In determining whether probable cause has dissipated, rendering the warrant fatally stale, Courts consider the following factors: the lapse of time between the information establishing probable case and the issuance of the warrant, "the nature of the criminal activity, and the kind of property subject to the search." United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997); see United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007); United States v. Estey, 595 F.3d 836, 840 (8th Cir. 2010). "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be

considered." United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007) (quotation and internal quotation marks omitted); see United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999).

In the present case, the information establishing probable cause to support the issuance of the January 24, 2023, Search Warrant was not stale. The lapse in time between the individual entering the Residence on January 17, 2023, and the issuance of the January 24, 2023, Search Warrant for the Residence was only slightly less than one week with no indication that any activity occurred in the intervening time which would materially reduce the likelihood of evidence related to the January 17th homicide being found at the Residence. "Courts have found that information that is weeks or months old linking illegal behavior to a residence is not stale." United States v. Smialek, No. 18-cr-123 (JNE/BRT), 2018 WL 5067498, at *8 (D. Minn. Aug. 30, 2018) (collecting cases), report and recommendation adopted, 2018 WL 5045776 (D. Minn. Oct. 17, 2018), aff'd, 970 F.3d 1070 (8th Cir. 2020); see, e.g., United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996) (collecting cases); United States v. Golay, 502 F.2d 182, 187 n.10 (8th Cir. 1974) (finding sixteen-day-old information regarding the location of stolen diamonds to be not stale).

Notably, the evidence sought by the January 24, 2023, Search Warrant is of the type which is not perishable thus tending to demonstrate that it is more likely that the information contained in the affidavit is not stale. See United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007) ("When there is little opportunity to dispose of evidence, it is more likely that the information contained in a search warrant affidavit is not stale."). Similarly, the information contained within Officer Trautman's affidavit is not stale merely, as Defendant now asserts, because it is equally possible that any evidence left at the Residence on January 17th could have since been removed. See United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996) (holding

affidavit was not stale where it was "equally possible" that stolen property was still in residence as that it had been removed during the interim two weeks). Under the facts of the present case, the Court finds that the information establishing probable cause in Officer Trautman's affidavit was not stale.

In addition, assuming solely for the sake of argument that upon this four corners review the affidavit of Officer Trautman was now deemed not sufficient to establish probable cause, the Court concludes that officers relied in good faith on the probable cause determination by Judge Raupp when executing the January 24, 2023, Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001).

Here, Defendant's only assertion related to this good faith exception is his conclusory assertion that the exception does not apply because Officer Trautman's affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. The Court has, however, already rejected the argument that Officer Trautman's affidavit was lacking

a sufficient basis for Judge Raupp to find probable cause to support the issuance of the January 24, 2023, Search Warrant. For all the reasons discussed above, Officer Trautman's affidavit in support of the January 24, 2023, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued by Judge Raupp authorizing the search of the Residence militates against suppressing the evidence obtained during the execution of the January 24, 2023, Search Warrant. There is <u>no</u> indication on the record now before the Court that Judge Raupp was misled by any statement within Officer Trautman's affidavit. Likewise, the record now before the Court lacks any indication that Judge Raupp wholly abandoned his judicial role in issuing the January 24, 2023, Search Warrant.

Thus, the Court concludes that the officers involved relied in good faith on the January 24, 2023, Search Warrant for the Residence at issue which had been issued by Judge Raupp.

Therefore, the undersigned recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**.

## VIII.   Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Discovery and Inspection, [Docket No. 15], is **GRANTED in part** and **DENIED in part**, as set forth herein;

2.  Defendant's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 16], is **GRANTED**, as set forth herein;

3.  Defendant's Motion to Compel Disclosure of Evidence Favorable to the Defendant, [Docket No. 17], is **GRANTED**, as set forth herein;

4.  Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 18], is **DENIED as moot**;

5.  Defendant's Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 19], is **GRANTED**, as set forth herein; and

6.  Defendant's Motion for Disclosure of Result and Reports of Forensic Testing, [Docket No. 20], is **GRANTED in part** and **DENIED in part**, as set forth herein.

Furthermore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Defendant's Motion to Dismiss Count 5 of the Indictment, [Docket No. 21], be **DENIED**; and

2.  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**.


Dated: November 30, 2023                          s/ Leo I. Brisbois
                                        Hon. Leo I. Brisbois
                                        U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.